UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AUBREY NOVAK | : | |
| PLAINTIFF, | : | |
| VS. | : | NO. |
| YALE UNIVERSITY, | : | |
| DEFENDANT. | : | FEBRUARY 5, 2014 |

**C O M P L A I N T**

1. This is an action for money damages to redress the deprivation by the defendant of rights secured to the plaintiff by the laws of the United States and the State of Connecticut. The defendant subjected the plaintiff to, inter alia, violation of the rights secured to the plaintiff by the provisions of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C.A.§ 2000e; the Connecticut Fair Employment Practices Act, Sections 46a-58(a) et seq. of the Connecticut General Statutes; and to the intentional infliction of emotional distress, in contravention of the laws of the United States and the laws of the State of Connecticut, as invoked pursuant to the Court's supplemental jurisdiction.

2. Jurisdiction of this Court is invoked under the provisions of Sections 1331, 1337, 1343, 1343(3) and/or 1367(a) of Title 28 of the United States Code.

3. During all times mentioned in this action, the plaintiff, Aubrey Novak was and is an adult citizen of the United States residing in New Haven, Connecticut.

4. At all times relevant to the instant complaint, the defendant Yale University was and is an employer located in New Haven, employing more than one hundred persons.

5. At all times referenced herein, the individuals mentioned herein were agents, officers or employees of the defendant University, acting in said capacity.

6. The defendant Yale has adopted, ratified, sanctioned or otherwise accepted as its own the actions, omissions, words and conduct of the the individuals named herein, and of their agents, officers or employees. The defendant University has thereby incurred liability for the for the acts, omissions, statements and conduct of the said individuals and of their agents, officers or employees.

7. The plaintiff is a highly skilled and exceedingly well qualified individual with a strong educational and employment background.

8. The plaintiff, Aubrey Novak, is female.

9. The plaintiff is employed by the defendant Yale University as a Catalog Assistant, Digital Projects and Metadata Unit of the Beinecke Rare Book and Manuscript Library.

10. The plaintiff has been, and continues to be subjected to a hostile work environment at the defendant. The plaintiff has been sexually harassed, subjected to discrimination and retaliated against for her complaints to the defendant.

11. On or about May 7, 2010, the plaintiff made a formal complaint to the defendant of sexual harassment and stalking by David Driscoll, an employee of the defendant.

12. On that date, the plaintiff met with agent of the defendant Lynn Ieronimo, Head of Security, Beinecke Rare Book and Manuscript Library. The plaintiff reported to her that she had been suffering from sexual harassment. The plaintiff provided evidence of this conduct, including emails from Driscoll to her.

13. Ieronimo informed the plaintiff that she had seen Driscoll stalking her outside of the library. Ieronimo told the plaintiff that she had personally witnessed a stalking incident, in which Ieronimo saw Driscoll crouching behind a wall and bushes while watching the plaintiff. Ieronimo saw Driscoll follow the plaintiff at a distance, and then peep in through the windows of the Handivan that the plaintiff was seated in.

14. The plaintiff informed her supervisor, Rebekah Irwin and the Studio Manager, Chris Edwards of the unlawful conduct. Ieronimo informed then Director Frank Turner of Driscoll's conduct.

15. Irwin, Edwards, Ieronimo, Turner and Driscoll are all agents, employees or officers of the defendant.

16. On May 27, 2010, Driscoll came at the plaintiff in the office after being contacted by agent of the defendant EEOC, Title IX coordinator Valarie Stanley about wanting to meet with him. Driscoll was irate and shouting loudly. He cornered the plaintiff in the office and demanded that she tell him the details of her complaint, stating, “I know you filed a complaint against me! I want to know what you said!”, among other things. The plaintiff repeatedly asked him to stop and was visibly upset by his behavior.

17. Driscoll refused to stop and as the plaintiff tried to get away from him, he continued to follow and shout demands at the plaintiff. After a few attempts to get away from him, the plaintiff was able to get through the back hallway and get as quickly as she could to the security office.

18. The conduct was so outrageous and frightening that another employee who witnessed it went for help. At the same time, The plaintiff made a dash for the security office down the back hallway. They let the plaintiff in and the plaintiff explained what happened.

19. Driscoll left the building but he was taken to Library Human Resources upon his return. He was placed on two weeks paid suspension for “breaking the

confidentiality of an investigation". He was not punished for his unlawful stalking, threatening and harassing behavior toward the plaintiff.

20. On May 28, 2010, the plaintiff went to the Yale Police Department to file a report about the events. The plaintiff was interviewed by two detectives, Sue Dercole and Peter Bruno. They instructed the plaintiff not to go to either her Union or to the New Haven Police Department, claiming that it would interfere with their investigation. The plaintiff found this very curious, but followed their instructions.

21. Dercole and Bruno are agents, employees or officers of the defendant.

23. Ieronimo showed them the place where she witnessed the stalking incident. The plaintiff was told that Driscoll's computer would be searched to see if it contained either photographs of the plaintiff or text documents with information about her. The plaintiff was told that if there were either on his computer that Driscoll would be arrested for criminal conduct.

24. Despite the promises of the defendant, no search was ever done. When the plaintiff inquired about the results of the computer search, she was informed that it had not, and would not be done. The plaintiff never received an answer from the defendant as to why the search was not conducted.

25. Thereafter, the plaintiff met with Human Resources officers of the defendant regarding the incidents which occurred on May 27, 2010.

26. On June 3, 2010, the plaintiff again met with the defendant's police department detectives. The plaintiff was told that she was "too friendly" in the e-mails for them to do anything about it. The plaintiff was also told she plaintiff could not get a restraining or protective order against Driscoll because the plaintiff never had a relationship with him. Nothing about searching his computer was mentioned.

27. On June 8, 2010, the plaintiff again met with agents of the defendant. Diane Turner, the Head of Library HR, falsely claimed that Driscoll had no prior disciplinary actions in his record. It became clear that the defendant was not going to properly address the unlawful conduct to which the plaintiff had been subjected.

28. The defendant treated the plaintiff's complaints of witnessed sexual harassment, stalking and threatening in a way that improperly favored the male victimizer.

29. Thereafter, agent of the defendant Turner informed the plaintiff that Driscoll would be allowed to return to work. She stated, "There is no problem here."

30. The plaintiff protested the decision, telling them they were making a mistake and missing the red flags. Turner remarked "Show me the evidence." The plaintiff had already presented a large amount of concrete evidence, some literally printed in black and white, to the defendant.

31. On June 14, 2010, the plaintiff was shown a letter sent to Driscoll by the defendant's HR department. The letter was signed by Turner and specifically

mentioned a December 2007 incident of misconduct, for which Driscoll received discipline by the defendant.

32. The letter then described the May 27, 2010 incident during which Driscoll cornered her in the office as “vitriolic” conduct for which he received his second official warning. The letter further stated that any other infractions would lead to his termination. The plaintiff was asked if she agreed with what was written in the letter, specifically about the incident involving her, and she said yes.

33. Upon his return to work, Driscoll was not supposed to be subjected to a range of prohibitions upon his conduct related to the plaintiff. Although the defendant put these prohibitions in place, it never enforced them. Driscoll was not permitted to speak to the plaintiff at all, even regarding work-related matters. Driscoll was not permitted to use the back hallway so that the plaintiff could have access to all areas of the building without having to be seen by him. Driscoll could only enter plaintiff’s office space to retrieve material from one range to either side of the door connecting their two spaces.

34. From the outset, it was apparent that the defendant would not enforce these restrictions. Driscoll repeatedly violated the prohibitions without sanctions from the defendant.

35. On July 14, 2010, the plaintiff sent an email to agent of defendant Andrea Terrillion, then Head of Labor Management, requesting a meeting about her complaints as to how the defendant's investigation was mishandled.

36. On July 27, 2010, the plaintiff met with her supervisor, and later, Terrillion. The plaintiff complained that the sexual harassment was not adequately addressed, and that Driscoll still had unfettered contact with her.

37. Once again, the plaintiff's complaints were being ignored or dismissed. Terrillion told the plaintiff that it was summer and many people were on vacation. Despite claiming that she would address the plaintiff's complaints, after one further email, the plaintiff never heard from her again.

38. The plaintiff continued to try to get help from the defendant, and on October 12, 2010, the plaintiff again met with defendant's Human Resources department.

39. Thereafter, the plaintiff contacted the ACLU Civil Rights attorney hotline about the issues at her workplace.

40. In July, 2011, Driscoll again engaged in harassing conduct towards the plaintiff. The plaintiff complained to her supervisors Jennifer Meehan and Sarah Fisher. Meehan and Fisher both claimed not to be aware of Driscoll's misconduct toward the plaintiff, and of the supposed restrictions on him to prevent further harassment and threatening of the plaintiff.

41. The plaintiff was extremely alarmed by this. It was clear that the defendant was doing nothing to protect her. The defendant had previously assured the plaintiff that any incoming supervisors and all incoming security staff would be made aware that Driscoll had restrictions in place due to his behavior towards her.

42. Thereafter, the plaintiff again met with her supervisor to seek assistance to protect her from further harassment.

43. On August 5, 2011, the plaintiff sent an email requesting to meet with Donna Cable, who was the defendant's head of Labor Management. Cable did not meet with the plaintiff until October 2011.

44. On December 1, 2011, her supervisor claimed that the plaintiff had poor work attendance. The plaintiff asked and found out that there were no complaints or negative comments about her or her work.

45. This was retaliatory discipline upon the plaintiff in retaliation for her vocal and persistent complaints to the defendant.

46. On February 20, 2012, the plaintiff informed Driscoll's supervisor Chris Edwards that when they were in the photographer's studio at the same time, Driscoll would stop his work, turn around in his chair (away from the computer) and stare at the plaintiff the entire time the plaintiff was in the office. He simply stared at the plaintiff without moving or speaking, which was very distressing. The plaintiff informed Edwards that Driscoll's behavior was interfering with her ability to do her work.

47. In February, 2012, the plaintiff requested to meet with agent of defendant Dr. Stephanie Spangler to seek assistance in addressing the workplace harassment issues.

48. The plaintiff met with her on February 21, 2012. Spangler said that the plaintiff would hear from Cable. The plaintiff did, but Cable said only that she was "still working on it". The defendant had been telling the plaintiff that for some time, yet nothing changed.

49. On March 9, 2012, the plaintiff sent an e-mail to Spangler complaining about the response time and lack of concern on the part of Cable.

50. As a result of the harassment and the defendant's inaction, the plaintiff was forced to use her personal time off, including sick time and vacation time. On April 16, 2012, the defendant through her supervisor Beacom informed the plaintiff that it would not return this time to her.

51. On April 30, 2012, Beacom ordered the plaintiff to his office in front of some colleagues in a way calculated to cause her undue embarrassment. Once there, he falsely claimed that the plaintiff was not properly filling out time sheets, and that she plaintiff would be written up for insubordination and terminated.

52. This conduct was undertaken in retaliation for the plaintiff's complaints.

53. The plaintiff later sent an email to Mr. Beacom asking him to be more discreet when asking the plaintiff to come to his office to meet with him, as the plaintiff was embarrassed by how he ordered her to his office.

54. On May 17, 2012, the plaintiff met with Beacom regarding Kristy Dixon's upcoming appointment as head of the unit in which the plaintiff worked. The plaintiff wanted to ensure that Dixon was going to be told about the ongoing harassment by Driscoll, and the supposed restrictions on his contact with her.

55. The defendant made it clear that it did not intend to tell Dixon anything about the ongoing harassment issues.

56. The plaintiff asked agent of the defendant Beacom for a simple rearrangement of her office so that the studio manager, Mr. Edwards, sat at the doorway between her office and the photography studio. This would have prevented much of Driscoll 's contact with the plaintiff. Beacom scoffed at and refused the request.

57. On June 11, 2012, Driscoll emailed the plaintiff twice without copying his supervisor and her supervisor. This was a violation of the supposed restrictions on Driscoll's conduct toward her, and the plaintiff reported the violations to the defendant.

58. On June 12, 2012, Beacom instructed the plaintiff to meet with him and Dixon. In retaliation for reporting Driscoll's conduct, the plaintiff was subjected to false claims and accusations, and threats to her employment.

59. On June 20, 2012, the plaintiff met with Dixon and Ms. Cioffi of defendant's Human Resources department, to discuss several complaints. The plaintiff complained about her supervisors' claimed lack of knowledge of Driscoll's prior conduct, and the defendant's continued failure to address Driscoll's ongoing behavior. The plaintiff also complained about the retaliation she had been subjected to for making such complaints.

60. Thereafter, the defendant falsely alleged that The plaintiff had "harassed" security employees of the defendant. When the plaintiff confronted the defendant, it admitted that she had not harassed the employees. This is a further example of retaliation by the defendant for her complaints about sexual harassment, hostile work environment, and the defendant's failure to address her complaints.

62. The atmosphere of sexual misconduct, and the defendant's historic unlawful tolerance thereof, is pervasive and ongoing throughout the defendant. The extensive, systemic problem has been and is the subject of formal and informal complaints, including Title IX complaints, criminal investigations and prosecutions, and formal legal actions. The extent of the problem was acknowledged and admitted to by the defendant, inter alia, in the following documents and by the following officials of the defendant: Report of the Advisory Committee on Campus Climate (2011); Response from the President to the Advisory Committee on Campus Climate (2011); Report of the Task Force on Sexual Misconduct Education and Prevention (2010); Report of the Yale

University Women Faculty Forum Council on Sexual Misconduct at Yale (2009); Report of the Committee on Sexual Harassment and Assault Prevention Education in Yale College (2008); Report of Complaints of Sexual Misconduct Brought Forward From July 1, 2011 to December 31, 2011; Report of Complaints of Sexual Misconduct Brought Forward From January 1, 2012 to June 30, 2012; Report of Complaints of Sexual Misconduct Brought Forward From July 1, 2012 to December 31, 2012; Report of Complaints of Sexual Misconduct Brought Forward From January 1, 2013 to June 30, 2013; and, Report of Complaints of Sexual Misconduct Brought Forward From July 1, 2013 to December 31, 2013.

63. The harassment, discrimination hostile work environment and retaliation continues to the present date.

64. During her employment with the defendant, continuously and persisting to the present, the plaintiff has been and continues to be subjected to an ongoing pattern of harassment, discrimination, hostile work environment, retaliation and disparate treatment. The conduct is based upon sexual harassment, her gender, hostile work environment, and the fact that the plaintiff has complained about her treatment at the workplace, and about the unlawful conduct of other employees of the defendant.

65. The reasons given by the defendant for the plaintiff's poor review, lack of merit increase and termination are pretextual.

66. For an extended period of time continuing to the present, the plaintiff has been subjected to an ongoing pattern of harassment, discrimination, hostile work environment, disparate treatment based upon the plaintiff's gender, and the plaintiff's complaints thereon.

67. The conduct of the defendant and its agents, officers or employees has been continuous, persistent and unabated. The actions of the defendant therefore constitute a continuing course of conduct.

68. The reasons given by the defendant for the plaintiff's discipline are pretextual. The true reason for the conduct of the defendant is because of the plaintiff's gender and in retaliation for her opposition to the defendant's conduct.

69. The plaintiff has exhausted her administrative remedies in this matter, and has sought and received a Notice of Right To Sue letter from the United States Equal Employment Opportunity Commission, and a Release of Jurisdiction from the Connecticut Commission on Human Rights and Opportunities.

70. In the manner described above, the defendant has subjected the plaintiff to, inter alia, hostile work environment, discrimination based upon gender and retaliation.

71. In the manner described above, the actions of the defendants constitute violations of the provisions of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C.A.§ 2000e in contravention of the Constitution and laws of the United States.

72. As a result of the defendant's conduct, the plaintiff has suffered extreme anxiety, fear, terror, loss of safety and well being; has suffered severe emotional distress; has incurred financial loss and harm; has lost employment opportunities; has suffered loss of personal and professional reputation; has experienced physical, mental and emotional harm and suffering; and has been forced to incur attorney fees, costs and expenses and has suffered other harm and loss.

**COUNT TWO**

1.- 69. Paragraphs 1 through 69 of Count One are hereby made Paragraphs 1 through 69 of Count Two.

70. The conduct of the defendant constitutes violation of the provisions of the Connecticut Fair Employment Practices Act, Sections 46a-58(a) et seq. of the Connecticut General Statutes, in contravention of the Constitution and laws of the State of Connecticut.

71. As a result of the defendant's conduct, the plaintiff has suffered extreme anxiety, fear, terror, loss of safety and well being; has suffered severe emotional distress; has incurred financial loss and harm; has lost employment opportunities; has suffered loss of personal and professional reputation; has experienced physical, mental and emotional harm and suffering; and has been forced to incur attorney fees, costs and expenses and has suffered other harm and loss.

**COUNT THREE**

1.- 69. Paragraphs 1 through 69 of Count One are hereby made Paragraphs 1 through 69 of Count Three.

70. The actions of the defendant were extreme and outrageous.

71. The actions of the defendant were intentional.

72. The actions of the defendant were likely to cause severe emotional distress.

73. The actions of the defendant caused the plaintiff to suffer extreme emotional distress.

74. The conduct of the defendant constitutes the intentional infliction of emotional distress, in contravention of the laws of the State of Connecticut, invoked under this Court's supplementary jurisdiction.

75. As a result of the defendant’s conduct, the plaintiff has suffered extreme anxiety, fear, terror, loss of safety and well being; has suffered severe emotional distress; has incurred financial loss and harm; has lost employment opportunities; has suffered loss of personal and professional reputation; has experienced physical, mental and emotional harm and suffering; and has been forced to incur attorney fees, costs and expenses and has suffered other harm and loss.

**WHEREFORE**, the plaintiff claim judgment against the defendant as follows:

A. Compensatory damages;

B. Punitive damages;

C. Attorney fees and the costs of this action pursuant to all applicable provisions of state and federal law;

D. Equitable relief pursuant to 29 U.S.C.A.§§ 626(b) and (c), 633a(b) and (c) and all other applicable provisions of state and federal law;

E. Such other relief as this Court shall consider to be fair and equitable.

**CLAIM FOR JURY TRIAL**

The plaintiff claims trial by jury of all issues in this case.

THE PLAINTIFF

BY__________/s/_William S. Palmieri_____________

WILLIAM S. PALMIERI
Law Offices of William S. Palmieri, L.L.C.
Federal Bar No. ct14361
129 Church Street, Suite 405
New Haven, CT 06510
PHONE: (203) 562-3100
FAX: (203) 909-6006
EMAIL: wpalmieri@hotmail.com
Her Attorney